# UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA ASHEVILLE DIVISION
## 1:11cr82

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | **MEMORANDUM** |
| ) | **AND** |
| SHARRON JAMES GAYLORD, ) | **RECOMMENDATION** |
| ) | |
| Defendant. ) | |
| _____ ) | |

Pending before the Court is Defendant's Motion to Suppress [# 11]. Defendant moves to suppress statements made to the police, as well as the two firearms found during a subsequent search of the residence of Janice Carswell. On January 3, 2012, the Court held an evidentiary hearing on the motion. Upon consideration of the testimony at the hearing, the record, the parties' briefs, and the argument of counsel, the Court **RECOMMENDS** that the District Court **GRANT in part** and **DENY in part** Defendant's motion.

**I.    Factual Background**

Sergeant Chris Howington is an officer with the Shelby Police Department. (Hr'g Tr. 4, Jan 3, 2012.) Officer Howington has worked at the Shelby Police

1

Department for approximately fifteen years. (Hr'g Tr. 5.) On January 6, 2011, Lieutenant Ligon with the York County Drug Enforcement Unit contacted Officer Howington regarding marijuana trafficking in the City of Shelby. (Hr'g Tr. 6.) Lieutenant Ligon informed Officer Howington that a van involved in marijuana trafficking was registered to 925 Kearney Drive, Shelby, North Carolina. (Hr'g Tr. 7.) Later that afternoon, Officer Howington and Lieutenant Ligon went to 925 Kearney Drive, which was the residence of Janice Carswell. (Hr'g Tr. 7, 45.)

Upon arriving at 925 Kearney Drive, the officers approached the residence and knocked on the door. (Hr'g Tr. 7, 24, 55.) Defendant Gaylord, who was an overnight guest in the residence, came to the door. (Hr'g Tr. 7, 24, 45, 55.) Defendant Gaylord then stepped out onto the front porch to talk to the officers. (Hr'g Tr. 8, 24, 55.) Lieutenant Ligon asked Defendant Gaylord about the van, and Defendant Gaylord stated that the van belonged to his girlfriend, Janice Carswell. (Hr'g Tr. 8, 57.) Officer Howington testified that Defendant Gaylord appeared nervous as they were questioning him about the van. (Hr'g Tr. 8, 24.) The officers then asked him for identification. (Hr'g Tr. 8.)

Around this time, the door opened a second time and Ms. Carswell stepped out of the residence. (Hr'g Tr. 8.) Officer Howington testified that he smelled a strong odor of marijuana when the door opened and Ms. Carswell exited the

residence. (Hr'g Tr. 8, 27.) Although Defendant Gaylord did not believe Ms. Carswell was actively smoking marijuana while he was on the porch talking to the officers, he testified that Officer Howington could have smelled the lingering scent of marijuana from earlier in the day. (Hr'g Tr. 56.) At approximately 4:15 p.m., Ms. Carswell went back inside the residence and the officers decided to leave and set up surveillance of the residence. (Hr'g Tr. 9, 28.) This entire encounter lasted approximately ten minutes. (Hr'g Tr. 28.)

After leaving the residence, the officers set up surveillance across the street in a wooded area. (Hr'g Tr. 9.) Two minutes after leaving the residence, however, Ms. Carswell ran out of the house with another female, jumped into a car, and drove away. (Hr'g Tr. 9, 29.) Because Officer Howington was concerned that they were leaving the residence with marijuana, he contacted another officer and requested that the officer stop the car Ms. Carswell and the other female were driving. (Hr'g Tr. 10.) Officer Howington also called another officer and requested that he get a search warrant to search the residence. (Hr'g Tr. 10, 29.)

Officer Howington then approached the residence for a second time in order to lock the house down prior to obtaining a search warrant. (Hr'g Tr. 10.) When he knocked on the door, Defendant Gaylord came to the door. (Hr'g Tr. 11, 19.) Officer Howington placed Defendant Gaylord in handcuffs and explained to him

3

that they were in the process of obtaining a search warrant for the residence and were locking down the residence. (Hr'g Tr. 11-12 29.) Although the officers did not tell Defendant Gaylord that he was under arrest, he was not free to leave. (Hr'g Tr. 11, 18, 29-30.) Officer Howington did not read Defendant his Miranda rights at the time. (Hr'g Tr. 29-30.) Officer Howington testified that Defendant Gaylord was detained in the house so that the officers could "investigate what was going on." (Hr'g Tr. 13.) A security sweep of the residence did not reveal any firearms. (Hr'g Tr. 19.)

While the officers were awaiting the search warrant, Defendant Gaylord remained in handcuffs on the couch in the living room. (Hr'g Tr. 11.) Between one and four police officers were present in the living room the entire time Defendant Gaylord was on the couch. (Hr'g Tr. 21.) Over two hours later, at 6:50 p.m., Detective Vickery arrived with the search warrant, and the officers began searching the residence. (Hr'g Tr. 13-14, 34.) While Defendant Gaylord was on the couch, and before Detective Vickery arrived with the search warrant, Defendant Gaylord told Officer Howington that there were guns in the house. (Hr'g Tr. 12, 30, 60-62.) The parties, however, dispute exactly how this testimony was elicited from Defendant Gaylord.

According to Officer Howington, Defendant Gaylord began talking after he

4

had been sitting on the couch for awhile. (Hr'g Tr. 12.) Although Officer Howington testified that he did not ask Defendant Gaylord any questions, he told Defendant Gaylord that "the car had been stopped and that some marijuana had been found in the car." (Hr'g Tr. 12, 30.) In response to this statement by Officer Howington, Officer Howington testified that Defendant Gaylord told him that while there were no drugs in the house, he might find a couple of guns. (Hr'g Tr. 12.) In addition, Officer Howington testified that Defendant told him that he was a convicted felon and told him that the guns were located in the bedroom closet. (Hr'g Tr. 12-14, 31.) Officer Howington contends that he did not ask Defendant Gaylord where the guns were located or any other questions; Defendant Gaylord volunteered the information on his own. (Hr'g Tr. 12-13, 30.)

Defendant Gaylord, however, tells a different story. Defendant Gaylord testified that he did not tell the officers that he was a convicted felon until after they searched the residence. (Hr'g Tr. 12-13, 30.) According to Defendant Gaylord, during the search of the residence the officers found letters Defendant Gaylord wrote Ms. Carswell while in prison. (Hr'g Tr. 46, 62.) Lieutenant Ligon approached Defendant Gaylord about the letters and asked him who was a convicted felon in the house. (Hr'g Tr. 46, 62.) In response to this question, Defendant contends that he told Lieutenant Ligon that he was a convicted felon.

5

(Hr'g Tr. 46, 62.)

Similarly, Defendant Gaylord testified that several minutes after placing Defendant Gaylord in handcuffs, Officer Howington asked Defendant Gaylord if there was anything illegal in the house. (Hr'g Tr. 47, 59-60.) Although Defendant Gaylord does not recall stating that there were no drugs in the house, he testified that he told Officer Howington there were guns in the closet. (Hr'g Tr. 47, 59-62.) According to Defendant Gaylord, everything he said about the guns was in response to a question asked by an officer. (Hr'g Tr. 62.)

After Detective Vickery arrived with the search warrant, the officers searched the residence and discovered two handguns. (Hr'g Tr. 13-14, 34.) Defendant was then placed under arrest and transported to the Shelby Police Department. (Hr'g Tr.14.) The officers advised Defendant Gaylord of his <u>Miranda</u> rights at this time. (Hr'g Tr. 35.) Subsequently, the Grand Jury indicted Defendant Gaylord on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Indictment p. 1, Oct. 4, 2011.) Defendant now moves to suppress the statements he made to the officers, as well as the guns found during the search.

## II. Analysis

### A. The Warrantless Entry into the Premises did not Violate the Fourth Amendment

The Fourth Amendment to the United States Constitution generally prohibits the warrantless entry and search inside a home. Kentucky v. King, 131 S. Ct. 1849, 1856 (2011); Brigham City, Utah v. Stuart, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947 (2006). The warrant requirement, however, is subject to certain reasonable exceptions. Kentucky, 131 S. Ct. at 1856; Brigham City, 547 U.S. at 403, 126 S. Ct. at 1947. One such well-recognized exception is that police officers may make a warrantless entry onto private property to prevent the "imminent destruction of evidence." Brigham City, 547 U.S. at 403, 126 S. Ct. at 1947; see also Kentucky, 131 S. Ct. at 1856; Hunsberger v. Wood, 570 F.3d 546, 553 (4th Cir. 2009); United States v. Grissett, 925 F.2d 776, 778 (4th Cir. 1991). "Exigent circumstances can arise when the evidence might be destroyed before a search warrant could be obtained." Grissett, 925 F.2d at 778. In determining whether exigent circumstances justify a warrantless entry or search of a home, the Court must assess whether the totality of the circumstances confronting the officers at the time of entry made it objectively reasonable for the officers to believe that contraband was present in the home and might be destroyed. See Brigham City, 547 U.S. at 404, 126 S. Ct. at 1948 (holding that officers subjective motivation is

7

irrelevant); Hunsberger, 570 F.3d at 554-55; Grissett, 925 F.2d at 778; United States v. Simmons, 661 F.3d 151, 157 (2nd Cir. 2011); see also United States v. Willis, 443 F. App'x 806, 808 (4th Cir. 2011) (unpublished).

Based on the totality of the circumstances, it was reasonable for the officers to enter the residence at 925 Kearney Drive prior to obtaining a search warrant. The officers had reason to believe that a vehicle involved in the trafficking of marijuana was registered to this address. When the officers initially approached the house, identified themselves, and questioned Defendant Gaylord and Ms. Carswell about the van, they smelled a strong odor of marijuana. Moreover, Officer Howington testified that Defendant Gaylord appeared nervous when he asked him about the van. The officers, however, did not enter the home at that time. Instead, they left the premises in order to set up surveillance of the residence.

Two minutes after the officers left the residence, they observed Ms. Carswell and another female running from the house and getting into a car. The officers knew that at least one individual, Defendant Gaylord, was still in the residence. As both the Supreme Court and the Fourth Circuit have recognized, drugs are easily disposable. See Kentucky, 131 S. Ct. at 1857 ("Destruction of evidence issues probably occur most frequently in drug cases because drugs may

be easily destroyed by flushing them down a toilet or rinsing them down a drain.");
Grissett, 925 F.2d at 778. Based on the circumstances when the officers entered the residence at 925 Kearney Drive, an officer in their position could reasonably believe that either Defendant Gaylord or another individual in the home would attempt to destroy the evidence - in this case drugs - before the police could return with a search warrant. See Grissett, 925 F.2d at 778. Accordingly, the Court finds that the officers did not violate the Fourth Amendment when they entered the residence at 925 Kearney Drive prior to obtaining a search warrant.

    **B.**    **The Detention of Defendant Gaylord Prior to the Issuance of a Search Warrant was an Unlawful Arrest**

Defendant Gaylord also contends that his detention while the officers awaited the search warrant for 925 Kearney Drive violated the Fourth Amendment. The Government contends that his detention was lawful under Illinois v. McArthur, 531 U.S. 326, 121 S. Ct. 946 (2001).[1]

In McArthur, the Supreme Court held that the seizure of an individual's private residence was reasonable under the Fourth Amendment while the officers obtained a search warrant because the police reasonably believed that the suspect would destroy evidence in the home unless the residence was secured. 531 U.S. at

---

[1] The Government does not provide any other authority in support of its contention that Defendant Gaylord's detention was lawful.

330-33, 121 S. Ct. 946, 949-51. In McArthur, the officers secured the residence at issue by prohibiting the defendant from entering his residence without being accompanied by a police officer until a search warrant for the residence was secured. Id. at 333, 121 S. Ct. at 950. The officers did not search the residence until the search warrant arrived and did not arrest the defendant. Id. At the suppression hearing in the state court, the officer testified that no officer told defendant he was under arrest, placed him in handcuffs, or told him that he was not free to leave. People v. McArthur 713 N.E.2d 93, 94 (Ill. App. Ct. 1999). In fact, the defendant was allowed to re-enter the residence on two or three occasions to get cigarettes and make telephone calls. McArthur, 531 U.S. at 329, 121 S. Ct. at 949.

The officers in this case, however, went well beyond the restrictions imposed on the defendant in McArthur while securing the residence. In order to secure 925 Kearney Drive and prohibit the destruction of evidence, the officers placed Defendant Gaylord in handcuffs, then entered the residence and conducted a security sweep. No drugs, weapons or contraband were located during this security sweep. Once they secured the premises, the officers left Defendant Gaylord in handcuffs for over two hours while they waited for a search warrant. As Officer Howington testified, Defendant Gaylord was not free to leave. There were

between one and four officer in the room with him the entire time. The Officers did not simply secure the premises and prohibit Defendant Gaylord from reentering the residence unless he was escorted by an officer. See e.g., McArthur, 531 U.S. at 333, 121 S. Ct. at 950; United States v. Christie, 570 F. Supp. 2d 657, 661 (D.N.J. 2008) (after securing residence, officers told the individuals that they were under no obligation to remain with agents but could not reenter the dwelling unless accompanied by agents); United States v. Small, No. 4:06cr6, 2006 WL 940326, at *2 (E.D. Va. Apr. 11, 2006) (after securing residence, officers told the defendant that he was free to leave but if he stayed he had to stay on the couch).

In short, this Court does not read McArthur to allow the police to enter a residence in order to prevent the destruction of evidence and then, once the residence is secured, keep the occupants of the residence - in this case an overnight guest - in handcuffs and prevent them from leaving for several hours while the officers await a search warrant. As Officer Howington testified, Defendant Gaylord was detained so that they could investigate what was going on. Once the premises were secure, there were no exigent circumstances or threat of destruction of evidence that warranted the detention of Defendant Gaylord. Therefore, while the entry into and seizure of Ms. Carswell's private residence in this case was reasonable to prevent the destruction of evidence, the seizure of Defendant Gaylord

was not.

The Court finds that the restraints imposed on Defendant Gaylord in this case were not reasonable under the circumstances, and Defendant Gaylord was arrested within the meaning of the Fourth Amendment when the officers placed him in handcuffs on the couch of Ms. Carswell's residence and prohibiting him from leaving the premisses for over two hours.  See Kaupp v. Texas, 538 U.S. 626, 629-31, 123 S. Ct. 1843, 1845-46 (2003); United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002).  As an overnight guest in the home of Ms. Carswell, Defendant Gaylord was subject to the Fourth Amendment's protection against a warrantless arrest while in her home.  Minnesota v. Olson, 495 U.S. 91, 96, 110 S. Ct. 1684, 1687-88 (1990); see also United States v. McCraw, 920 F.2d 224, 229 (4th Cir. 1990); Haley v. Armontrout, 924 F.2d 735, 737 (8th Cir. 1991).

As a result of the unlawful seizure of Defendant Gaylord, any evidence obtained as a result of this Fourth Amendment violation is generally inadmissible at trial.  United States v. Oscar-Torres, 507 F.3d 224, 227 (4th Cir. 2007); United States v. Seidman, 156 F.3d 542, 548 (4th Cir. 1998).  This rule also applies to any statements made by Defendant Gaylord after this arrest. Seidman, 156 F.3d at 548.  Statements, however, are admissible where an intervening act of free will purges the primary taint of the warrantless arrest.  Kaupp, 538 U.S. at 632-33, 123 S. Ct.

at 1847; Seidman, 156 F.3d at 548.  The burden is on the Government to show that the statements are admissible.  Kaupp, 538 U.S. at 633, 123 S. Ct. at 1847; Seidman, 156 F.3d at 548.  The following factors are relevant to determining whether the statements are admissible: (1) the amount of time between the arrest and the statements; (2) the presence of the intervening circumstances; (3) the purpose and flagrancy of the official misconduct, and (4) the observance of Miranda.  Kaupp, 538 U.S. at 633, 123 S. Ct. at 1847; Seidman, 156 F.3d at 548.

Here, the Government does not even attempt to show that the statements are admissible under these factors, instead arguing only that Defendant Gaylord was not unlawfully seized under the Fourth Amendment.  (Gov.'s Resp. at 7.)  Accordingly, the Court finds that the Government has not met its burden of demonstrating that the statements made by Defendant Gaylord to the officers after his unlawful arrest are admissible.  Moreover, upon an independent review of the evidence and the factors enumerated by the Supreme Court and Fourth Circuit, the Court finds that the Government cannot demonstrate that the statements are admissible.  Here, the officers did not provide Defendant Gaylord with Miranda warnings, the statements were made shortly after his unlawful arrest, no intervening circumstances occurred, and the misconduct of the officers was flagrant.  Accordingly, the Court finds that the statements made by Defendant

Gaylord that he was a felon and that there were guns in the house are inadmissible.

C. The Two Firearms are Admissible at Trial

Defendant Gaylord also contends that the two firearms found during the search of the residence are fruits of the poisonous tree and should also be suppressed. Although Defendant Gaylord told the officers that the firearms were in the closet after his unlawful arrest, the officers did not search the closet at that time or otherwise retrieve the weapons. When the search warrant arrived, the officers searched the home and located the two handguns. Defendant does not challenge the legality of the search warrant, and it was not based on the statements made by Defendant Gaylord; the officers applied for the search warrant prior to arresting Defendant Gaylord.

The Court finds that based on the evidence in the record, the discovery of the guns during the search of the home pursuant to a valid search warrant is "sufficiently distinguishable" from the unlawful arrest to purge the handguns of the primary taint of the Fourth Amendment violation in this case. Wong Sun v. United States, 371 U.S. 471, 488, 83 S. Ct. 407, 417 (1963); United States v. Gray, 491 F.3d 138, 154 (4th Cir. 2007). The search warrant and lawful search of the residence is a sufficient intervening circumstance to purge the taint of Defendant Gaylord's unlawful detention. See Seidman, 156 F.3d at 548; see also United

14

States v. Howe, 414 F. App'x 579, 581-82 (4th Cir. 2011) (unpublished). Finally, the record does not support the conclusion that were it not for the statements Defendant Gaylord made to the officers, the officers would not have found the weapons while searching the house for drugs or other contraband. Accordingly, the Court finds that the two firearms discovered by the officers while executing a search of the residence pursuant to a valid search warrant are admissible.

### III. Conclusion

The Court **RECOMMENDS** that the District Court **GRANT in part** and **DENY in part** the Motion to Suppress [# 11]. The Court **RECOMMENDS** that the Court **GRANT** the motion and suppress the statements made by Defendant Gaylord while he was detained and **DENY** the motion as to the two firearms.

Signed: February 15, 2012

*[signature]*

Dennis L. Howell
United States Magistrate Judge